Fall Line Patents, LLC Fall Line Patents, Inc.  We will hear argument next in number 21-108. Good morning, Your Honors. May it please the Court? The automatic transfer of data would have been obvious to a person of ordinary skill in the art as of 2001, and there does not appear to be a dispute as to this contention in the record. Right, I'm sorry, but the automatic transfer of data? Correct, Your Honor. Right, that's not the issue. It's also not the issue whether the automatic transfer upstream from the handheld to the server was taught in Barbosa or Hancock. It's very specifically whether the automatic transfer of a questionnaire, let's assume for purposes of this question, that that could just be a group of questions, downstream is taught by one of these two sources. That's correct, Your Honor, yes. However, the issue that we see from the petition and what the Board did in its institution decision and then its final written decision is that it overlooked how obvious it would be to automate that transfer. Now, there is no contention that there isn't a disclosure of sending a set of questions, for example, in these two references, but whether that transmission was automatic as opposed to manual. Now, when we filed the petition, the petitioner filed the petition initially, our argument was that these references did disclose this or at least rendered it obvious or suggested it, especially when combined with false. Mr. Bonilla, I don't see here in your petition it was argued that it at least rendered it obvious. Instead, all I see in there is that this limitation is disclosed in the primary reference. Could you tell me if I'm missing something or pointed to something in the petition that shows me that for this particular limitation there was an argument that it would have been  No, Your Honor, I'm not going to say that the word obvious is in our petition with respect to this limitation. What we've said is that Barbosa and Hancock did disclose this. That's true. And the reason we said that, for example, let's take a look at Barbosa. So in the petition, specifically at appendix page 161, in 161 we identified three different excerpts of Barbosa that discuss the idea of synchronization, synchronization and two-way communication. And then on that page we argued that a person of ordinary skill in the art would understand synchronization to mean the automatic transfer of data when there is a connection present and storing the data to then upload that data when the connection resumes. So in that argument we're saying that a person of ordinary skill in the art would understand that these disclosures in Barbosa would have been an automatic transfer of data because of the need for synchronization. Specifically, Barbosa discusses using the handheld device and not having to plug it in or to dial up that at the beginning of a session an assessor's handheld device would be uploaded, would be synchronized with the inventory or with the questionnaire for them to fill out in their field assessment. So for purposes of this question, let me stipulate that the material that you cited in your reply from Barbosa, column 10 and 11, do that. Okay. You didn't cite those. So where in the column 3, column 6, which is I think the only material that you cited at 161 on Barbosa, where in those passages, particular passages, is the idea of two things. And that's one aspect. And the second is where did you explain how those passages teach the automatic downstream sending? So I think that the portion of those excerpts that discusses the automatic transmission is its references to synchronization and specifically two-way synchronization. And then you can't just look at the Barbosa reference. If we just look at those excerpts on their own, that may not be sufficient. But in addition to Barbosa, we also relied on the Roman Declaration where our expert witness explained what a person of ordinary skill in the art would understand after reading that passage or those passages. Can you point to exactly what that is in the Roman Declaration? What page? That might be helpful. So the Roman Declaration, it's 813 maybe? Yes, I think it is 813. I want to know, I think it would be helpful to know which sentence I'm specifically relying on to give his explanation of what those past excerpts are saying. So it's paragraph 177 of his declaration. But if you look at the petition there at 161, he makes the same argument, that a person of ordinary skill in the art would understand this automatic transmission because of the synchronization of these two devices. And specifically that that would occur with this intermittent network. When the connection is available, the transmission is automatic. When it's not available, the data is stored until it can be transmitted upon reconnection. So I understand you would be saying that the discussion of the plain element, transferring of the questionnaire, is not just discussed in the one sentence that says the transfer occurs automatically and is disclosed, for example. But you have to look at the next sentence that says, because all those passages talk about synchronization and being in a loose network, I guess, where it could be disconnected. And then this extra sentence that you're pointing to today is probably going to be bruised, but is explaining that and saying in that kind of situation, a person would know that you have to have automatic transfer. I presume the reason why is because it would be very annoying if the user had to sit there and transfer every time the devices disconnect from one another on this loose network. Absolutely, Your Honor. And that's what Mr. Roman is explaining, what a person of ordinary skill in the art would take this understanding away from the reference. It would read Barbosa and understand, okay, we have synchronization. We're trying to do this so that we've got everybody in the field on the same page. They're answering the same questions wherever their field assessments are, and they're answering the questions based on the inventory that we've got. So at the beginning of their work day, that upload should occur. And then while they're out in the field, if they happen to lose connectivity, they can continue to work on the questionnaire, but once connectivity is reestablished, then the data can be transferred. And so a person of ordinary skill in the art reading Barbosa would understand this because we're talking about really one of two options. It's either a manual transmission or an automatic transmission. And to automate the transmission using computer devices in 2001 would have been obvious. Now, with respect to... But you didn't argue that it would have been obvious. Instead, it's a person of ordinary skill in the art would understand that that would happen in this reference, right? That's correct. Just to be distinct, because in your reply, which is the reply that the board said raises new arguments, in that reply, you've got two different things I see there with respect to this reference. One is look at columns 11 and maybe 12, and the other one is it would have been obvious to modify the reference. That's correct. I see a distinction between those. It would have been obvious to modify the reference. It sounds like a new ground. How do you respond to that? Well, all six of the grounds that we asserted in the petition were under 103. They're all obvious miscombinations. I understand, but it's a different thing to say prior reference X teaches this claim element as opposed to a person of ordinary skill in the art would have known to modify prior reference X to have this claim element. I see those as being quite different. I understand that, Your Honor. I don't think that you need to modify Barbosa in order to get to this claim element. I think the board standard is that you can clarify, but you can't make a new ground on new argument, right? Yeah, and I think this is part of what happened with the oral argument where it seemed as if the board was very much concerned that we didn't actually say this renders it obvious. We said it discloses it. But because it was under 103, our expectation was what we're saying is this discloses enough information. It teaches a person of ordinary skill in the art the suggestion such that a person of ordinary skill in the art would be able to practice this claim and practice this limitation. So we're not saying you have to modify Barbosa necessarily in order to reach this limitation. If I read your reply as having two different things. One is, hey, the reference does disclose it. Look at column 11. And then the other one is even if it doesn't, it would have been obvious to modify. Can I come up with a different determination for those two different grounds? So I think it's possible to interpret it that way, Your Honor, if you think that the second ground is that there needs to be a modification of Barbosa in order to reach this limitation, as opposed to just a person of ordinary skill in the art would combine their knowledge with the disclosure of Barbosa to understand that this synchronization should be automatic. And so if we're looking at it that way, then no, I don't think you've got two different grounds where you come out in two different ways. But if the reply is understood to argue that the Barbosa reference needs to actually be modified to what's in Barbosa in order to reach this limitation, then I think there would be an argument that's a new ground. And then that would be an issue, one of the issues that the board, for example, raised about the reply arguments. One of the things the board emphasized was that your petition has to actually state with particularity, and our case is whole, so to state with particularity what you're claiming the reference to teach and how it meets, satisfies the claim limitations. And why then should you be able to clarify by pointing to a different column of the patent if it wasn't clear to the board in the petition what ground you were serving? Well, there's two reasons for that, Your Honor. One is that we, in our petition, expected that the understanding of a person of ordinary skill in the art would encompass automatic transmission of data. That seems like a fairly fundamental, rudimentary thing. But you didn't assert it. Well, we certainly did, Your Honor, by saying that in seeing synchronization between these two devices, a person of ordinary skill in the art would understand that synchronization to be automatic. And then the second issue is that— And I mean, as I'm hearing this discussion, that is, I'm going to say, your one point. And the board said kind of two things about it. One, we don't see it in the relevant sections, the cited column three, column six, but I think it also said you didn't actually explain that in a way that meets the standard for explain with particularity how a particular requirement of the claim is met. That second piece, was that really an abusive discretion? Which is the standard, right? It is the standard with respect to whether the reply arguments were—  —needed to be considered. Or what was fairly understood to have been asserted and explained and under the standards of particularity in the petition. Yes, Your Honor. And I do think that it was because of two reasons. One, there's no evidence of non-obviousness. The patent owner didn't actually argue that it wouldn't have been obvious. Did the patent owner in its preliminary response— —because for some reason you all excluded this from the joint appendix— —respond to the assertion at 161 that Barthos discloses the automatic transfer? No, Your Honor. At no point did the patent owner respond to that particular assertion. The only thing the patent owner did was say, in the institution decision, the board said that the petitioners had failed to— Wait, but I was asking about the preliminary. Maybe I've got this wrong. The preliminary response, doesn't that come before institution? It doesn't. There's no mention in that about this. Okay. So you have what is admittedly, I think, a bare-bones statement in your petition about Barbosa disclosing automatic transfer, and we have to read that for what it is. And your friend on the other side can clearly explain this better, but you're saying— —and again, it's not in the appendix— —they didn't respond to that. No, Your Honor. The board raised this argument for the first time in its institution decision. That's right. The only thing that the patent owner said in the preliminary response was focus on other limitations, not this one. And then after the institution decision, the only thing the patent owner said was the board was right in its institution decision. Just on that point, I was thinking a little bit about what significance, if any, what is missing from a preliminary response might be given. And the following thought occurred to me, and I'd like to hear you answer it. In light of SAS, it would be a stupid waste of paper for a patent owner to pick a claim element in a highly aberrational claim. And as far as I can tell, only this claim talks about automatically downstream. That will not get the board to say, I'm not going to institute if I think I should institute on the other—I don't know how many—many other claims. So the fact that the preliminary response doesn't focus on this quite aberrational claim element feels like it isn't much of a concession because you wouldn't put your energy into doing that when SAS says if you find enough to go forward, you've got to go forward with the whole thing. That may be true, Your Honor, but then they had their full patent owner response and their with something other than the board got it right at the institution decision, which is all we have from the patent owner. Can I just ask this question? Suppose, hypothetically, that we agree that the board abused its discretion in saying that the opening petition didn't fairly enough assert and explain something about 7B and that, in addition, that allows the additional material, particularly Column 11, to come in and that establishes—let's assume again for this question—that that actually establishes the presence of 7B in Barbosa. Is this a reversal? Is it a remand? Are there other claim elements that were genuinely in dispute but not reached by the board or what? Thank you, Your Honor. I see I'm running out of time. May I answer your question? Yes, please do. We think this should be a reversal because there are other limitations that were in dispute. Many of the limitations that are in the rest of Claim 7 are also in Claims 1, 5, and 19 through 22, which the board found were unpatentable in view of these references, and there isn't an actual dispute beyond just this particular limitation. So we do think the appropriate solution here, resolution here, is a reversal. I have a quick question before you sit down. What is an executable questionnaire versus a questionnaire? So a questionnaire is just a set of questions. It's like Form 33C that I had to fill out this morning, where you just have a set of questions. An executable questionnaire, the idea behind this patent purportedly, is that you would tokenize each question so that it's part of an application almost, like a program, and in that program, you're able to move questions in and out by executing various portions of it. And the idea is that once you download this questionnaire, so like in Hancock, you have the GoTo application, you would download that application, and it would run its questions and receive answers from the user and then submit it to the central server. So it's doing more than simply being a list of questions that can be answered. There is some programming behind it. Thank you. I'm sorry. So an executable questionnaire requires something more than a list of questions with a space at the end of each one for giving an answer? Just a fill-outable set of questions? It does need to be more than that, Your Honor, because we have questionnaires, we have the use of tokens, although they're not in Claim 7. Just remind me, since we haven't really had occasion to have that brief, the word tokenization and tokens may mean something blindingly clear to you. It doesn't to me. Tell me what it means. Sure. So a token, it could be a particular set of code or a small, like a modular piece of code. Was that construed in reference to other claims? In reference to other claims, it was in the lower court. And what did it say? Right now, I don't remember exactly what it was. And was there a development through back and forth or something of what executable means as applied to the questionnaire for Claim 7? No, Your Honor. I don't think there was a discussion about executable. The parties seem to agree that an executable questionnaire is not just a questionnaire, but actually a questionnaire that can be executed. So like a modular program. Sorry, I'm a little confused. When you say it can be executed, does that just mean you can answer it on whatever your handheld device is? Or is it something more? Because it seemed to me the focus of all this briefing was not really about what executable or questionnaire meant, but whether something was automatically transferred. That's correct, Your Honor. And as far as whether the executable questionnaire was something more, we actually had pursued invalidity under 101 in the District Court. And one of our arguments was that there isn't much to this executable questionnaire in light of what's in the specification. So there hasn't been any dispute as to just exactly what an executable questionnaire is other than it is not just a questionnaire. Did the Board or the other side object to the teachings of any of these things that they show executable questionnaire as opposed to not showing automatic? There were some aspects where the Board did. For example, with Hancock, it found some of those aspects. Sure, but not with Barbosa. That's correct, Your Honor. Okay. So the Board, with respect to Barbosa, did not say that even if this reply material came in, a thing shown going downstream from server to handheld is not an executable questionnaire? Not with respect to Barbosa, Your Honor. I see. Okay. Thank you. We will restore your rebuttal time. Mr. Antonelli. Good morning. May it please the Court. I'd like to quickly just address three issues that were just raised in the argument on behalf of petitioners. First, this issue of the sufficiency of the original showing, that indeed is an issue that is reviewed for an abuse of discretion. And the Court can find that in the M-modal case at 846, Fed Appendix 900 at 906. Do I understand correctly, the real question here is whether, I think, whether the Board clearly in its fact-finding of whether there was a clarification being made or not?  And the reason I think that's wrong really goes to the first point I want to discuss this morning, which is the Board's original decision and its final written decision on the original petition, it did not actually turn on these issues of whether there was anything like that. Rather, what the Board found was that petitioners simply did not meet their burden at all. So with respect to, and I think it's important we don't lose sight of this because there's been a lot of argument that's been built on top of some very, very simple things that happened at the beginning of this proceeding. Do you mean didn't meet their burden with this fairly high-level couple sentences on page 161, or didn't meet their burden if we determined that the other evidence should have been considered? So I focused only on the original petition, did not meet the burden in the original petition, and there isn't even a couple sentences in the original petition on this. On Barbosa, there's a single sentence. And it's interesting the way it's set up, because it's done in three pieces. I see two sentences, but I don't want to quibble too much. I mean, it says Barbosa discloses transferring the design questions, and then the next sentence says it occurs automatically, which is the limitation that's at issue, right? Right. And so for when I say a single sentence, I'm referring to the second sentence your Honor just referred to as being the one that addresses the automatically issue. That is all they said, and then they pointed to three sections of Barbosa with no explanation whatsoever. But if those sentences are true, if Barbosa discloses an automatic transfer of questionnaire, all of which is covered in that paragraph, and the evidence supports it, then that would have been sufficient. Would it not? Under some kind of pleading standard? I think that changes the burden incorrectly, Your Honor, because the issue is not whether that evidence would have been sufficient to support a contrary finding in favor of petitioners. The question is, was the Board within its rights to say you needed to show more? You needed to explain why you say these things in these three different sections of Barbosa teach that it's an automatic requirement. And you did not explain that. And that was not an abuse of discretion for the Board to reach that conclusion. And that's what I think the M. Lowe case stands for. And this is even in light of what I guess as I am hearing is, to my mind, the one thing that the other side has to say, which is paragraph 177 of the declaration to which the relevant sentence at 161 of the petition points, and that 177 paragraph said, is that 813 or something? I've got the wrong case. Which says, synchronization, everybody understands, is automatic, at least in this context. So I don't think, and it's bidirectional. Which the reference to bidirectional in column three, I think, doesn't quite say that. But the expert sort of says that. I don't think that's right, Elmer. The argument that we now know this is automatic because there's a disclosure of synchronization and everyone knows that synchronization is automatic in the correct sense, that is a new argument that is being raised on appeal. It's not an argument that was presented in the original petition. Because there's a sentence in the petition. There is, for a different limitation, Your Honor. So I think what's happening is there's a conflation between the initial requirement that the design questionnaire be automatically downloaded, and then there's an entirely separate section on the solution network requirement. I'm still confused about what you're saying. I'm looking at this expert declaration, which is at 812 and 813. I think this is the expert declaration, right? Yes. I mean, sure, the expert is also stating this in fairly conclusory fashion. But he's stating his expert conclusion. His affidavit is being supplied for this, and he's saying, people know that this is what Farbosa, or I know this is what Farbosa discloses. I just don't understand why that's not sufficient to put you on notice and put the board on notice of what they're arguing meets this limitation. Also, go ahead. I have a question. Your Honor, the statement from paragraph 176 at appendix 812 is virtually verbatim the same statement from the petition. All it is is a conclusory assertion that the limitation is in there somewhere, and then a citation to the exact same portions. In paragraph 177 is the paragraph that has the pertinent sentence, and you said that this sentence relates to a different claim limitation. Indeed. But why is it under the heading C, which starts on page 812, that says automatically transfers a design questionnaire to at least one loosely networked computer having a GPS integral there too? What other limitation could this possibly be referring to? There is no other data being called for to be automatically transferred besides the design questionnaire in this claim element, which is discussed in the following paragraphs, following that heading. Right. So there are two requirements in what has been designated as Step 7B of Claim 7. One is that there has to be an automatic transfer of the designated questionnaire, and another is that that questionnaire has to be sent to a loosely networked computer, which is like the handheld device in the field. And really, the loosely networked aspect of this had to do with the intermittent connections when the user is using the device and the ability to store, really, responses to questions and transfer that data up when the connections become available. And I think that structure is completely shown by the structure of petitioners' own papers here. So in the petition, for example, in Barbosa, they do three things. They address the transfer for this step, then they make the conclusory sentence about automatic, and then they go on to discuss the loosely networked requirement. Are you saying that paragraph 177 is relying on the conclusion of automatic to show that in fact it's a loosely networked computer in Barbosa? Is that what your position is? Because otherwise I'm not really following you. I'm sorry. The word about what paragraph 177 talks about is data being automatically transferred. And that's what— It's the only data. It's, again, the heading that precedes that paragraph. There's several paragraphs, 176, 177, 178, that talk about automatically transferring said design questionnaire. I don't know what other data you're referring to. What other data could this paragraph be referring to? Your Honor, it could easily be, for example, the answers to the question. Not in 17. Indeed, it could. So the requirement is the handheld device must be a loosely networked computer. That's it. And the reason it's loosely networked is because it may have the ability to do the store-and-forward process in answering questions. In fact, that's consistent with what's going on here. And that is why—I think that is why a petitioner treated these things as separate limitations in their own presentation of the petition. And it's what the Board found. The Board said when it read—the Board, when it was reading these arguments about what was fairly disclosed in the original petition, it found that the only thing that was said was this individual sentence, both in the petition and in Mr. Roman's declaration. Can we just get to—sorry. I'm going to—I want to talk about one of our books, actually. Do you have more stuff on the abuse of discretion? Assuming I disagree with you about the abuse of discretion and that the Board should have considered the additional arguments—not new arguments, I don't think they're new—additional arguments presented in the reply brief, why—and I'm with you on Hancock. I don't think Hancock even with the additional argument is sufficient. But why, at least on a substantial argument standard, why doesn't BARBOSA clearly disclose the automatic transfer of the questionnaire? It's odd because—let me just tell you where I'm coming from. I'm not going to specifically cite the points. But my understanding is it discloses transferring templates and that those templates can be accompanied by questionnaires or task lists or things like that that can be executed and used by the user on the handheld. Isn't that fulfilling the automatically transferring limitation of sending out a questionnaire? No, Your Honor. I think the Board's conclusion to the contrary was supported by substantial evidence and by concession by petitioners during the IPR trial. So in the reply brief, petitioners pointed to these various portions of columns, I think, 10, 11, and 12, to refer to these various updates, I think, they referred to for checklists and things like that that could be sent down. And the Board concluded that not only is that new argument— Okay. I think I know what you're talking about. You're talking about the question and answer with Mr. Bonilla and where he talks about it might just be data. Correct. Right. But so here's my issue with that is just because he said it might be just data doesn't mean that Barbosa doesn't also disclose transferring executable questionnaires, i.e., it doesn't just talk about data. It potentially talks about both. And transferring data clearly is not sufficient, but if it does the other two, then it is sufficient. What's wrong with that? What's wrong with that, Your Honor, is the clear import of Judge Kennedy's questions during the trial was that petitioners were relying on certain things and saying those particular disclosures in Barbosa, they show an executable questionnaire. And the question that was put to petitioners was, wait a second, you're saying that that somehow shows an executable questionnaire, but what you're pointing to could just be data, right? And petitioners conceded that point and said, yes, it could just be data. And I think what that shows is that what they were relying on is not sufficient. Well, let me, I don't read that as concession because what you're saying, their concession is that it only shows data. They're saying it could just be data, but they don't say it only must be data. I think there is somewhere in between. It's important. I think their concession was that the portions that they were relying on were insufficient to establish an executable questionnaire. I think that was the import of that concession. But even putting the concession aside, can you just address the actual, apart from that concession, which I don't read that way, address the actual parts of Barbosa when they're talking about automatically transferring a questionnaire and task lists and stuff like that, why that isn't sufficient to meet this automatic limitation rather than focus on an ambiguous concession? So putting aside the concession point, the board's finding that those also found, not just based on the concession, but found that those were not executable questionnaires. And I think that finding is supported by substantial evidence because, refer me to where the board makes that finding so we can look at what evidence they're referring to. Okay. So, appendix 50, which is the final written decision, the board explains that petitioners were relying on the testimony of Mr. Roman and that Mr. Roman testified that what we've been calling these updates counted as executable questionnaires. And then what the board said was there was not an adequate explanation for why those would be an executable questionnaire. Again, even in Mr. Roman's declaration, the assertion was purely conclusory and there was a lack of explanation about why that would satisfy the executable questionnaire. Just to be clear, I think Mr. Bonilla said that with respect to Barbosa, the board did not say a thing you point to on reply is not an executable questionnaire. I take this paragraph on page 50 to say exactly that. I think that's correct. And that's referring to page, paragraph 25 of Roman's reply declaration, which is 1566-67. Correct. Is there something in that paragraph that explains why whatever this notion of executable means is, which I gather is something more than giving answers to questions. I think that's what Mr. Bonilla said. Absolutely. It is something more and I can address that if the court wishes. Yeah, I really actually am very interested in this heretofore unexplained notion of what executable means, which I had actually taken to mean it has blanks that you can fill in to respond to questions. But Mr. Bonilla says, no, no, no, it means something more, but I don't understand the more. Yes, Your Honor. I mean, the basic idea in Mr. Payne's patent, and I don't know this record other than the patent itself, is that what you would do is you would build a layer on a device, on a handheld device that would be sort of an executing layer. And then the questionnaires, when they would come in, would be processed by that executing layer. And you could achieve that through, for example, tokenization, which is something that is in some of the claims that would be a way to make it an executable questionnaire. So it's not just the data of the questions, but there has to be something more to the process where there's something on the device that can then execute them. And the basic idea was to build that in that extra layer of abstraction because way back when this stuff was done, which was in the era of the beginning of the Palm Pilot, people were actually having problems when they had surveys that they were doing and questionnaires that they were doing where something you'd want to change and you'd have to actually go and recompile and redo the entire system and do it separately for different kinds of devices and those kinds of things. And so executable essentially means something in between that can execute that process, interpret that data in a meaningful way. Now, it doesn't go as far... Can I ask you a question? The word executable is sometimes used to know executable software, for example. Does it have the same meaning in that context or is it totally different? No, Your Honor. It's not... It doesn't mean that this has to be written in, for example, C code and compiled and be done like that. So like, for example, and this is, again, it's not a record, but from the prior... One thing that was absolutely clear is XML tag, for example, would count as a form of tokenization that would render the questionnaire executable. That was an example. So it's executable in some computer science sense, but it's not the executable you may be thinking of where you have an object file that's been compiled and you want to actually execute the... How much of what you've just been explaining about what executable means and how much of what Mr. Bonilla was explaining about the same subject was the subject of briefing argument in front of the board? None at all, Your Honor, because this came up only in Petitioner's Revival. And then there was just, again, the broad assertion that, here, we can point to these other columns, 10, 11, 12. Those things are... Those things satisfy the limitation. And there was no attempt to explain how it matched up with all the other components of the claim, all the other pieces of the puzzle. It was just kind of a, this meets this, and this meets this, and... Can I ask you the same question I asked Mr. Bonilla? Suppose that we thought that the board erred in not considering the reply material or in finding it too late, as a shorthand, and also suppose that then the question is, what do we do? One question is, do we have to remand on the application for reconsideration of the reply material in part to understand the correctness or not of this executable term? And putting aside 7B, suppose we even thought 7B was met by Column 11 by Barbosa. Is there something more to remand? Are other elements of Claim 7 genuinely in dispute, or what? I think I understand various parts of the question. Let me take them one at a time. So, first of all, even if this court says it's not new, it was okay to put it in the reply brief, I still think the result is petitioners still lose because of the board's rejection of that issue on the merits, because the board addressed that as an alternative. But, assuming I don't get over that hurdle, then I do think it has to be a remand just on 7B alone, right? Just on 7B alone, on this automatic issue, because that issue was addressed for the first time in petitioner's reply brief, right? Where they pointed to these things for the first time and claimed that they were transferring an executable questionnaire. What about claim limitations other than 7B? Is there a difference? That last part of your earlier question, I don't know the answer to that question immediately. I'd have to look back for it. I'm way over my time. Yeah, you're a little bit over, because I was going to give you more time anyway, but you've exceeded even that, but you've been answering questions yet. Any last thing you want to say that's not repetitive? Oh, I had six or seven pages on whether there was a new claim construction involved that would warrant... I think that would be a new argument. I will let it sit down at this point. Thank you. Thank you. Can I ask you, because I'm still... It seems like everybody just points this up and says, this either shows it or doesn't show it. It doesn't explain to me why it does or doesn't, so I'm left with reading Barbosa and trying to figure it out on my own, which normally would mean that you would lose. I wouldn't overturn a substantial preference, but can I ask you to address particularly columns 11 through 32 of Barbosa, that's column 12, 1666? Because that seems to me to be the closest to that, a very layman's reading of that. Sorry, which line is column 11? It's column 12, lines 11 through 32, 1666. I mean, particularly it's talking about sending templates including something in the form of a Java applet, which sounds an awful lot to me like something that would be executable. Yes. Can you just explain those using a specific language about why? Because the board offhandedly references that, but its explanation of why that's insufficient is confusing to me. So it's confusing to us as well, Your Honor, and I think the place to look for that is at appendix page 21, which is the board's final written decision discussing a similar limitation of tokenized questionnaire as opposed to executable questionnaire. And there are several paragraphs here on page 21 where the board talks about how Barbosa teaches this transfer of instructions in the form, for example, of a Java applet, and that that would be a tokenized questionnaire because it would be a questionnaire that's broken up into various modules for each question, tokens for each question. And that's very similar to our understanding of what an executable questionnaire would be. It would be a questionnaire that is modularized such that you have these various questions that can then be executed upon transfer to the handheld device. And certainly the discussion in column 12 about the potential to use a Java applet, which I think would meet the definition of executable, almost any definition of executable as far as we would understand it, a Java applet would do that, where you could send an applet to the device and it would operate to display the questionnaire and receive the answers from the user of the handheld device. So the board talks about it and says, yes, there's a disclosure here on page 21 about with respect to tokenized questionnaire. But then when it gets to the automatic transferring, now it says, well, there's some transfer of data here. Maybe it's automatic. But that doesn't necessarily mean it's actually the recited questionnaire. But that doesn't make a lot of sense. If you look at page 430 of the appendix, which is our reply brief, we explain how in looking at various columns, specifically 10, 11, and 12 in Barbosa, the idea is for this applet, this assessment, to be sent to the assessors at the beginning of their shift and to continue to keep everything in, to be consistent among the various assessors. And specifically that this daily input gets received and, quote, tasks are not repeated, wasting time, and that unfinished tasks are addressed. And so if that's – Could you – I'm going to just interrupt you for a second and say what you're doing here is helpful. But I think it would be really helpful – I think what Judge Hughes asked you is a really good question. And could you like walk through the disclosure on column 12, lines 11 through 32 and just say what those sentences mean? Because they're not written in a language that, you know, necessarily we would understand. Tell us what they mean to you. Sure, Your Honor. So we'll start at line 11. At their respective positions, assessors are provided a template from the remote server. That template is the executable questionnaire. That is what has all the questions for the assessment, has the fields that the assessor is going to fill in. The template may operate in a combination with programs resident in the handheld computer  For example, in the form of a Java app. Again, that's showing that it is an executable. What's being downloaded downstream to the handheld device is executable. And that's explaining that it can either be executed by a computer program already on the handheld or transmitted with the template through the example of a Java app. That's right. If the handheld device has already got the program on it in order to execute the template, it doesn't need the additional executable to go with it. If it hasn't before, this is the first time this handheld device has received that template, it would potentially need that additional applet to go with it in order for it to be executable if it wasn't resident on the handheld device. Your Honor, I see that I'm running out of time. So unless you have any further questions, I'll ask the Court to reverse. Thank you. Thank you. And thanks to the counsel for cases submitted. Thank you.